H. E. BENHAM, Plaintiff,

v.

WORLD AIRWAYS, INC., a Delaware corporation, Defendant.

Civ. No. 2346.

United States District Court
D. Hawaii.

Jan. 21, 1969.

As Amended Jan. 22, 1969.

---

See also D.C., 253 F.Supp. 588.

Padgett, Greeley, Marumoto & Akinaka, Honolulu, Hawaii, of counsel, by Frank D. Padgett, Honolulu, Hawaii, for plaintiff.

Smith, Wild, Beebe & Cades, Honolulu, Hawaii, of counsel, by J. Russell Cades and William M. Swope, Honolulu, Hawaii, for defendant.

## DECISION

TAVARES, District Judge.

This matter came on for trial on October 7, 1968, through October 12, 1968, jury waived, in which plaintiff H. E. Benham seeks judgment against defendant World Airways, Inc., a Delaware corporation, for breach of contract. Having heard and duly considered the testimony adduced from various witnesses in behalf of each party, the admissions contained in the pre-trial order, and the documents and other evidence adduced, the Court being now fully advised in the premises, and good cause appearing, the Court finds as follows.

Plaintiff, H. E. Benham ("Benham"), is a resident and citizen of the State of Hawaii.

Defendant, World Airways, Inc. ("World"), is a Delaware corporation having its principal place of business in Oakland, California.

The plaintiff, who is a graduate of the United State Naval Academy, was a pilot and a navigator with many years

experience in the aviation business, including experience with Pan American and Great Lakes Airways, prior to the time he came to Hawaii in 1959 as Chief Navigator for Hawaiian Airlines, and has been found qualified to testify as an expert in all matters concerning which he was permitted to testify.

In 1961 Hawaiian Airlines, which had been in the business of providing turnaround services for aircraft of other carriers transiting Honolulu, decided to go out of that business. At about the same time, Aloha Airlines decided to enter the business, and at that time a new corporation called Nav, Inc., was formed, owned 50% by Murrayair and 50% by the plaintiff, to provide such services. From early 1961 through September of 1962, that corporation conducted both ramp and office services. In 1962 the ramp services and the office services were split, with Murrayair retaining the ramp services under the name Air Service Corporation, and Benham retaining the office services which he operated under the trade name Facilities Mid-Pac, at that time. He continued to operate the office services up to and including the date of the trial. In 1966 the office services were incorporated under the name The Benham Corporation. Air Service Corporation meanwhile continued to operate the ramp services. Both, according to the testimony, were profitable, even though the volume, at the beginning at least, was quite small.

In September of 1964 World and Trans International Airlines ("TIA") had been performing jointly communication services for their own airlines at the Honolulu International Airport. TIA informed World that effective November 1, 1964, TIA would no longer be able to share and perform these communication services with World. As a result, World gave immediate attention to this problem of communications and also considered having another corporation or itself perform its own ground-handling services because World had become dissatisfied with the ground-handling services of Aloha Airlines, Inc.

World at that point was doing a fair amount of business in the way of transits through Honolulu, there having been thirty-five transits in September, 1964 (Exhibit P–3). At this point of time, the other carrier was withdrawing from the arrangement it had made with World and World was looking around for someone to take over the office services or possibly to go into the business of providing turnaround services itself. To this end, Mr. Daly, President of World, among others, went through Benham's office to look at his setup with respect to the office services. Benham was soliciting World for its business on the office service side.

Also at this time World was interested in purchasing Air Service Corporation's assets for performing ramp services. Mr. Brian A. Cooke, a Director, Vice President and Assistant to the President of World, called Mr. Waterhouse of Air Services in England and asked him to stop by Oakland. When he did, he left with Cooke, a detailed breakdown of Air Services' assets, categorized so that those necessary in the ramp service could be separated, with the cost to Air Service of the various items. This breakdown was dated September 20, 1964. (Plaintiff's Exhibit 34.)

On October 15, 1964 Mr. Cooke telephoned Benham to ask if he would come to Oakland, California, to discuss the capability of Benham's firm, Facilities Mid-Pacific Co., a sole proprietorship ("FMPC"), performing the communication as well as passenger services for World. Mr. Benham accepted the invitation, and on the morning of October 19, 1964 he met with certain officers of World to explain to them FMPC's communication and passenger services facilities. Mr. Benham met with Mr. Cooke, and Benham was asked if he was interested in selling his business to World and accepting employment with World as the head of a new handling agency to be known as World Air Center Hawaii. Mr. Benham rejected this proposal. Messrs. Benham and Cooke then met with Mr. Daly who offered the same

proposal which was also rejected. Thereupon Mr. Daly suggested that World and Benham go into business together. The parties discussed the concept of creating a World Air Center Hawaii along lines similar to the World Air Center which World was then operating in Oakland.

Mr. Daly proposed the formation of a new corporation, World Air Center Hawaii, to provide complete turnaround and ground handling services at the Honolulu International Airport. Four Directors were designated; Mr. Daly proposed that Benham be President of the new corporation at a starting salary of $18,000 per annum; that each party contribute $5,000 as initial working capital; that World arrange for the purchase of the assets of Air Service Corporation and finance the purchase out of a loan to be negotiated by World in an amount of approximately $100,000; Benham was to contribute his office

services business and assets; World would contribute its transit business and seek to induce other users including Continental, TIA, Slick and those listed in Exhibit P–24 to contract services; the distribution of shares in the new corporation was to be such as to establish a 50–50 stock ownership. A rough draft or memorandum of the main terms of the agreement was prepared on October 20, 1964 by Daly and/or some of his subordinates in World, and presented by Daly to Benham, who took the draft back to Honolulu with him. Minor modifications were made thereafter by World to this rough memorandum and the modified memorandum was mailed to Benham on October 21, 1964. The changes consisted of amendments to Paragraphs 7a and b with paragraphs 8 and 9 in addition. There is no dispute that the parties did execute this written agreement as of October 20, 1964, and that the document was prepared for execution by the defendant (Exhibit P–1).[1]

1. This agreement, Exhibit P–1, as amended by Benham, in the respects above noted, was written on a World Airlines, Inc. letterhead, and reads as follows:
"Mr. H. E. Benham                                                    October 20, 1964
164 Kalalau Street
Honolulu, Hawaii 96821
"Dear Mr. Benham:
"This letter will serve to confirm the agreement reached this date between World Airways, Inc. (World) a Delaware corporation and Mr. H. E. Benham (Benham), 164 Kalalau Street, Honolulu, Hawaii 96821.
    "1—World and Benham will form a corporation to conduct business at the Honolulu International Airport, Hawaii providing turnaround aircraft maintenance services, aircraft cleaning, baggage handling, flight watch services, dispatch services, telecommunication services, passenger handling services and such other services as may be required by airlines using the Honolulu International Airport facilities.
    "2—The corporation will be organized either under the laws of the State of Hawaii or the State of California upon advice of counsel.
    "3—The Board of Directors of the corporation will consist of no less than four Directors. The initial Board of Directors will be comprised of the following:
            Edward J. Daly, Chairman of the Board
            H. E. Benham
            Brian A. Cooke
            David S. Ferguson
    "4—The officers of the corporation will be as follows:
            H. E. Benham, President
            Brian A. Cooke, Secretary and Treasurer
    "5—World and Benham agree that the salary of the President of the new corporation shall be fixed at $18,000 per annum.
    "6—World and Benham will each purchase for cash, $5,000 of the capital stock of the corporation.
    "7—World and Benham will make further contributions to the corporation without any consideration, as follows:
        "a. Benham will contribute at no charge, all of the physical assets of Facilities Mid Pacific Company, Dispatch Division, free and clear of

Further, there is no dispute that the aforesaid agreement (Exhibit P–1) was modified in writing under date of November 15, 1964, to provide that World was to acquire 51% of the stock and Benham 49% and that World would designate a majority of the Board of Directors (Exhibit P–2).[2]

The first question submitted for the Court's determination is whether or not the parties had entered into a contract. The Court is of the opinion that all of the essential elements of a contract have been established by a preponderance of the evidence. In this connection the Court has considered the facts and cir-

all liens and encumbrances and all of its customer accounts and good will.

"b. World will on behalf of the new corporation, provide for the necessary services and assistance in arranging for and procuring the financing necessary to acquire certain assets presently owned by Air Service Corporation and used in its operation at Honolulu International Airport. World further agrees that all of its required aircraft services at Honolulu International Airport shall be performed by the corporation contemplated to be organized under this Letter Agreement.

"8—Benham agrees that he will not directly or indirectly engage in any business similar to or competitive with the business of the new corporation at any time during which he is an officer and stockholder of the new corporation.

"9—Benham agrees that during the time he is an officer and stockholder of the new corporation to devote 100% of his time to the operation of the business of the new corporation.

"10—The name of the new corporation, if available, is to be World Air Center of Hawaii, Inc.

"11—World and Benham agree to use their best efforts to insure a commencement date for operations of the new corporation no later than 1 December 1964.

"12—World reserves the right to purchase its share of the capital stock of the new corporation either in its own name or in the name of World Air Center, Inc., a California corporation.

"Please sign the original and one copy of this letter in the space provided below signifying your understanding and agreement to the terms and conditions expressed herein.

"Very truly yours,

WORLD AIRWAYS, INC.

(Signed)  Edward J. Daly
Edward J. Daly
President

"Accepted:
(Signed)  H. E. Benham
H. E. Benham."

2. This amendment, made at the personal solicitation of Mr. Cooke, who made a special trip to Honolulu apparently to effect such amendment, is typed on Facilities Mid-Pacific Co. letterhead and reads as follows:

"15 November, 1964

"This note is to confirm the mutually acceptable modification of the agreement between World Airways, Inc. and Mr. H. E. Benham, dated October 20, 1964, to the effect that the terms and conditions specified in said agreement remain the same except that stock ownership in the corporation, WORLD AIR CENTER OF HAWAII, INC. shall be:

World Airways, Inc. (or World Air Center, Inc.)          51%
H. E. Benham                                              49%

"And that the majority stockholder may be represented on the Board of Directors by an additional member.

"Approved:  (Signed)  H. E. Benham
H. E. Benham

"Approved:  (Signed)  Brian Cooke, Vice President

~~Edward J. Daly~~
World Airways, Inc."

cumstances leading up to or which surrounded the parties and the contract. Defendants engage and had been engaging in a very similar business in Oakland and contracted for similar services for their own operations throughout the world. Mr. Benham was experienced in the same field. He went to Oakland at Defendant's request, prepared to try to sell his services to them. Defendant had a distinct advantage in that it knew in advance that it wanted to purchase Benham's business or to join in business with him. Defendant had already obtained detailed information as to the assets of Air Service Corporation and, from their operating expertise and close proximity to Benham's place of business, were in a position to know a great deal about his business and services.

There can be no serious contention that either Mr. Daly or Benham did not fully understand the terms of the agreement which they entered into as of October 20, 1964, or that either was misled or mistaken as to any term or condition thereof. The defendant has expressly disclaimed reliance upon any claim of mistake of fact as a basis for equitable relief such as rescission or cancellation, and, in any event, the pleadings and the theory upon which the case has been tried under the express or implied consent of the parties, are such that, under Rules 9(b) and 15(b) F.R.Civ.P., this type of relief against alleged mistake would not be allowable.

Moreover, it must be borne in mind that Benham was a very small operator with exceedingly limited assets, whereas World is a multi-million dollar enterprise with tremendous resources of material, manpower and expertise available to it and World drafted the agreement in question.

The defendant has urged upon the Court that the written undertakings were so vague, uncertain or incomplete, as to constitute only an understanding that negotiations had been entered upon which might lead to an agreement, or as defendant's counsel has suggested—as a mere "letter of intent." In this connection defendant refers to allegedly omitted, but allegedly essential items of agreement, such as the establishment of local bank accounts, payroll and accounting procedures and arrangements, space rental agreements, preparation of space, counter space and baggage conveyor lease, agreement as to service prices, printing of stationery, invoice forms, payroll checks, sales brochures, fabrication of handling equipment, recruiting and training, costs of the foregoing, lack of a capital expenditure budget, and lack of a specific financing commitment. Basically, even if not at least orally agreed upon, and many of them were, the items enumerated are all matters of business policy and management which the new corporation, once created, could and would properly undertake.

Various general authorities and specific cases and arguments have been cited and advanced by able counsel for the defendant in an attempt to support defendant's contention that the contract (as amended November 15, 1964) is so vague, incomplete and uncertain in its terms, that it is incapable of enforcement and therefore in effect constitutes no contract, and that, at most, it was a sort of "letter of intent" to make a contract later, after certain alleged essential terms should have been decided, which terms, it is contended, were in fact never fully agreed upon. There is little point in discussing these authorities, for, from this Court's reading of the general authorities, as well as the cases cited by defendant, this Court believes that none of the cases is fully in point, and that none of the contracts by those cited cases held unenforceable for vagueness or uncertainty was as definite as the contract here under consideration.

Suffice it to say that this Court believes that each case where alleged uncertainty is claimed, must stand on its own peculiar facts and circumstances; that in case of ambiguity (although there is no really fatal ambiguity here) where the party which prepared the document is responsible for the ambiguity, the contract must be construed

most strictly in favor of the other party;[3] that the construction placed upon the contract as to its being a binding contract (as was the case here until breached for no stated, plausible reason on December 22, 1964)[4] with sufficient definiteness to be enforceable, may be taken into consideration along with other circumstances to sustain the contract;[5] and that the contract is sufficiently complete and certain to be enforceable, at least in a damage action, regardless of what might be the case if specific performance had been sought by plaintiff.

■ Since the plaintiff insists upon enforcement of the contract by way of an award of damages for breach, and since the issue of rescission of contract has not been, and can not properly be, raised as a matter of equitable relief, the only remaining question is whether more than nominal damages should be awarded, and if so, how much.

The Court having found, and hereby finding, that the parties did as of October 20, 1964, enter into a valid and binding contract, we now turn to the consequences which flowed from the breach.

■ Throughout, the defendant has seemingly taken the position that World, after making a detailed analysis of the proposed business venture, had, in good faith, concluded that the proposed business could not be profitably undertaken without the injection of a substantially larger capital investment than the parties had obligated themselves to make. Defendant has somehow reasoned from this postulate that, having so concluded, defendant was justified in making a complete withdrawal from the project. The main thrust of the defendant's evidence and its examination of plaintiff and plaintiff's witnesses was to attempt to establish that the proposed venture could not succeed within the framework of the agreement.

The undisputed fact which came out at the trial was that on December 22, 1964, Mr. Cooke communicated to the plaintiff that defendant was not going to do anything further regarding the contract, P–1, as subsequently modified by Exhibit P–2.

In this connection Mr. and Mrs. Benham both testified that they had met Mr. Cooke, at the Ilikai Hotel in Honolulu; that a very brief meeting took place in front of the Coffee Shop, at which time Mr. Cooke simply informed Benham that "The Old Man has changed his mind" about the deal and gave no other reasons for World refusing to perform; and that Mr. Cooke offered Benham a payment of $500 to mitigate the failure of World to proceed with performance, which Benham refused, and both witnesses stated that they had not been inside the Coffee Shop with Mr. Cooke.

3. Authorities re construction are most strictly against person who drew contract. 17 Am.Jur.2d, Contracts, §§ 275, 276, pp. 688–691; 17A C.J.S. Contracts § 324, p. 217.

4. As stated elsewhere in this decision, the Court fully believes and accepts Benham's and Mrs. Benham's version that the only reason given by Cooke on December 22, 1964, for, and the first time World ever communicated to Benham, its decision not to perform, was that "The Old Man has changed his mind."

5. World, which drew the contract, thought it definite enough to require the rough draft to be initialed, first by Benham and Daly, then redrafted with substantial additions and amendments unilaterally inserted by World and signed by both (with acceptance of a minor amendment made by Benham to the final draft ratified by World), and thought it sufficiently definite so as to justify sending a special emissary, Cooke, to Honolulu, to procure the amendment of November 15, 1964, and to have that amendment signed by both parties, granting World Airways control of both the stock and the Board of Directors.

Moreover, World again recognized, in effect, that there was a contract, when at the conference of December 22, 1964, Mr. Cooke curtly stated that "The Old Man has changed his mind," and offered $500 as a consideration—undoubtedly for a mutual rescission which he hoped for, which would have protected World Airways from a breach of contract claim.

In contrast, Mr. Cooke testified that he did meet Mr. and Mrs. Benham at the Ilikai Hotel on December 22, 1964; but that the three breakfasted together in the Coffee Shop and discussed for more than an hour the reasons why World was withdrawing; that Benham was at that time requested by Mr. Cooke to submit an itemized statement of his costs, for which World would reimburse him, which he refused to do. Mr. Cooke also emphatically denied that he had ever referred to Mr. Daly as the "Old Man," attempting to convey the impression that such a reference would have been demeaning and farthest from Mr. Cooke's mind. The evidence disclosed that both Benham and Mr. Cooke had served in the Navy. It is common knowledge that Commanding Officers in the Navy are customarily referred to as "The Old Man" with no derogatory connotations whatever. The same is true in many other lines of business.

Viewing the evidence as a whole, the probabilities of the situation, the demeanor of the witnesses on the stand, especially that of Mr. Cooke and of Mr. and Mrs. Benham, the singular and apparently studied abstention of World from putting into writing, as would normally be expected, its reasons for asking for the amendment to the agreement of November 15, 1964, or anything else after the amendment of November 15, 1964, the failure of Mr. Daly, who would have been expected to be a prime witness, to appear or to testify even by deposition, the absolute difference between World's version and Benham's version of the December 22 incident, in which it is obvious that either Mr. Cooke or Mr. and Mrs. Benham are not telling the truth, and all other circumstances bearing upon the credibility of these and all other witnesses, this Court finds the plaintiff's version as a whole is very much more credible than that of the defendant.

In this connection the Court believes that while Mr. Benham's version is not free from some discrepancies or other weaknesses, these are of the type normally to be expected in the testimony of any honest witness, and that Mr. and Mrs. Benham were essentially honest and credible witnesses, whereas Mr. Cooke was ill at ease, and showed signs of acute mental distress throughout his testimony, especially where it was squarely contradictory to plaintiff's. Insofar therefore, as the resolution of what the facts were depends on the conflicting testimony of Mr. Cooke as against that of Mr. and Mrs. Benham and their witnesses, this Court believes the Benham version and disbelieves the Cooke version.

These discrepancies are so great in the Court's view, as to cast doubt upon the credibility of other evidence offered by defendant, such as that of Mr. McKenzie, which otherwise might not appear on its face to be subject to such weaknesses. In other words, the Court finds that the lack of credibility of the witness Cooke is so great as to taint and render suspect the entire case of the defendant on the merits.

In this connection the Court believes (with no reflection upon World's counsel) that the decision of World to refuse to perform the contract was not made in good faith, that the reasons therefor now given by World (if indeed they were the true reasons, which the Court has some doubt about), were not communicated to Benham on December 22, or until after this case had been filed, that most of the grounds now offered by defendant for failure to perform were afterthoughts, conjured up by defendant ex post facto to support its position, and that therefore any defense which depends on the good faith of an alleged decision reached by World falls for lack thereof. On the contrary, bad faith on defendant's part appears to this Court to have been affirmatively proved by the evidence in its entirety.

The evidence shows that plaintiff was conducting a small but successful busi-

ness in 1964 which consisted of providing office services to airlines which transited through Honolulu International Airport, and which did not maintain their own office facilities wholly or in part. The plaintiff had been engaged more actively in the ground handling or outside services functions at a previous period but had, prior to October, 1964, withdrawn from that companion type of service. He did, however, retain 10% ownership in "Air Service Corporation," engaged exclusively in the outside-ramp type of service. This, likewise, was a small but successful type of business.

The proposal which Mr. Benham made to World envisioned quite a unique operation. He proposed that the new company purchase the business of Air Service Corporation, detailed information concerning which World had previously acquired. He proposed to supplement this equipment with locally fabricated ramps, other used equipment, and some borrowed or rented gear as needed. There was no credible evidence sufficient to convince this Court that this program was impossible of accomplishment and would have failed to produce a reasonable profit.

Evidence was introduced regarding the capital investment of Aloha Airlines, which at the time in question, had become the dominant services provider, but which company was then providing services unsatisfactory to many airlines utilizing such services. No evidence indicated that Aloha's services were unsatisfactory because of the equipment they possessed, or any lack of it.

The other unique feature of the proposed business was that Benham proposed to utilize off-duty military personnel to the largest extent possible. Mr. Benham testified as to the availability of these personnel and the relatively low compensation which they would be paid, and their fully adequate competence to perform the services that would have been required. The evidence failed to establish that this phase of the proposed operation was not feasible. Testimony was presented to show the capital investment of Hawaiian Airlines, which organization a few years later succeeded to most of the transient business theretofore contracted to Aloha. A great deal of evidentiary material was presented as to the labor costs being incurred by Hawaiian—again several years later. Suffice it to say that Hawaiian, after deciding to re-enter the services business in 1967, purchased all new and expensive equipment. They also conducted their entire operation with a single-employment, fully unionized labor force. It was clear that, at and before the time of trial, Hawaiian's Honolulu operation was operating at a loss, but that their operation on the Island of Hawaii, although smaller, was operating at a profit. The profitability of any business, even a fairly large business, cannot be predetermined to a mathematical nicety. By the same token, this Court cannot with mathematical certainty determine what would have been the future of the new World Air Center Hawaii venture had it been launched. The law, fortunately, does not require such certainty.

The preponderance of the evidence has convinced this Court that plaintiff could have conducted a profitable operation had the new corporation been seasonably launched. A most significant fact is that Benham did expand his own office services business, and has done so profitably and is still in business.

The execution of a contract and a breach by the defendant having been established, but there being available no history of the actual operation of the new business proposed by the contract, the Court is obviously hard put to it to calculate accurately and adequately the amount of damages.

It does appear that Benham was to receive a salary of $18,000 per an-

num. The operation under the contract was to commence on December 1, 1964.

Exhibits P–14 through P–17 show Mr. Benham's personal income tax returns. He received no wages in 1964; $6,916.71 in 1965; $15,489.91 in 1966, and more than $18,000 in 1967. Under the contract, he would have received $1,500 in salary for December 1964, and $18,000 in 1965 and 1966. The differences are $1,500 in 1964; $11,083.29 in 1965 and $2,510.09 in 1966, or a total of $15,093.-38.

Exhibit P–13 sets forth the expenses and services of Benham. His out of pocket expenses in the sum of $3,050.70 and the claim of $1,000 for services during the last of October and for November, 1964 appear reasonable, for a total of $4,050.70.

There are a number of possible approaches toward a computation of prospective profits. The post-trial memorandum of plaintiff has detailed approaches which find substantial support in the evidence. The figures submitted in Exhibits P–26 and P–27 show that plaintiff's 49% of the corporate earnings from 1964 through 1968 would have been $527,707. Another computation, Exhibit P–8, shows that plaintiff's 49% for the same period would have been $326,022.48.

Plaintiff has made a considerable profit from his office service business. Computed as above and for the same period, Benham would have been entitled to a profit of $73,587.45, which if deducted from $326,022.48, would leave a balance of $252,435.03.

A recapitulation of the foregoing would be as follows:

Prospective profits        $252,435.03
Out of pocket expense          4,050.70
Loss of wages                 15,093.38
                           $271,579.11.

In cross-examination of Benham and other witnesses for plaintiff, as well as by defendant's own evidence, defendant has sought to weaken or prove invalid or excessive the plaintiff's estimates or computations of prospective profits, or any profits at all. Without discussing these in detail, it suffices to say that the alleged deficiencies in plaintiff's evidence and computations, even if well taken (and many of them have not been shown to have been incorrect) are more than offset by plaintiff's total evidence, including, but not limited to: (1) lower labor and other personnel and training costs he would have incurred by running the business with G.I. moonlighting personnel (which this Court finds was the only method proposed by Benham and was acquiesced in to all outward appearances, and never repudiated by defendant until this trial, and which this Court finds was and would have been adequate and feasible under Benham's especially efficient, frugal and economical management); (2) the fact that Benham's testimony, believed by the Court, shows that in all of his projections he purposely adopted and followed very conservative figures, such as quite substantially higher cost estimates than his actual experience justified; (3) the fact that both Benham and Daly in 1964 agreed that Aloha's services were very unsatisfactory to its customers and therefore such business could easily be taken away by a new well-managed turn-around service,[6] which this Court believes and finds would and could have been organized and operated by *Benham* if World had lived up to its contract (that this is so is corroborated by the fact that three years later Hawaiian again went into the business and easily took away most of Aloha's turnaround business, even though Aloha had by then greatly increased its capital investment in equip-

---

6. The Court also believes Benham's testimony that Daly himself assured Benham confidently that he (Daly) could and would influence a substantial number of other airlines transiting to or through Honolulu to give their entire turnaround business to the new corporation and take it away from Aloha. This, considering Daly's overwhelming control of World, is practically an admission against interest of defendant World as to the likelihood of taking away most of Aloha's business.

ment); and (4) other circumstances including (although not essential to this Court's decision) recent CAB action certificating a number of additional airlines for direct service to Hawaii, of which this Court can take judicial notice.

According to the Court's recollection of its instructions to counsel after the parties had rested and requested time to file briefs, counsel for each party was to file proposed Findings of Fact and Conclusions of Law. This was not done by plaintiff's counsel. The Court not having had the benefit of plaintiff's suggested Findings of Fact and Conclusions of Law, orders that the foregoing be considered as the Court's partial Findings of Fact and Conclusions of Law, should any other such Findings and Conclusions be necessary to a complete disposition of this case.

If any such additional Findings and Conclusions are deemed by plaintiff's counsel to be so necessary, they shall be submitted to the Court by plaintiff not later than three days after the date of filing this decision. The defendant's counsel will have three days after the date of receipt of a copy of plaintiff's proposed additional Findings and Conclusions within which to submit defendant's objections, if any, to the same.

Judgment for damages in the total amount of $271,579.11, in accordance with the foregoing decision, and for costs, will be entered in favor of the plaintiff and against the defendant in the manner following: Upon the final entry of any such additional Findings of Fact and Conclusions of Law, a form of judgment shall be prepared by the plaintiff and submitted to the Court and the defendant, and if such form is objected to, the defendant shall have two days after receipt thereof to file objections to such form.

Judgment shall not be deemed to have been entered until such form of judgment as finally approved by the Court shall have been filed.